IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EDUARDO PACE, | : | CIVIL ACTION |
|     Plaintiff | : | |
| | : | |
| v. | : | NO. 06-5166 |
| | : | |
| MAINSTAY SUITES HOTEL, et al., | : | |
|     Defendants | : | |

**M E M O R A N D U M**

**STENGEL, J.**                                                                                          **November 5, 2008**

This is a diversity action alleging negligence against a hotel and an elevator service company arising from an injury suffered by Eduardo Pace while a long-term guest of the hotel on November 30, 2005. Both defendants have filed a motion for summary judgment to which the plaintiff has responded. For the following reasons, I will grant both motions in their entirety.

**I. BACKGROUND**

In 1989, Mr. Pace graduated with honors from the New York Restaurant School. (Pace Dep. at 37). While working at Al Johns Restaurant in West Windsor in 1990, Mr. Pace tore ligaments in his right wrist which required surgery. Id. at 39; see also Mainstay Exhibit C at 6. Since then, Mr. Pace has received workers compensation benefits. (Pace Dep. at 46). As a result of this wrist injury, Mr. Pace developed complex regional pain syndrome which causes him to be extremely sensitive to touch. Id. at 49, 50. In fact, Mr. Pace testified that even a breeze blowing over his right arm intensifies the pain. Id. at 55; see also Mainstay Exhibit C at 22. The regional pain syndrome has affected his legs to

the extent that over time he has progressed from using a cane to using a motorized wheelchair. (Pace Dep. at 52). In April 2002, Mr. Pace sought hyperbaric oxygenation treatments for relief of his symptoms in Columbia, Pennsylvania. Id. at 51, 193. During these treatments, Mr. Pace was a long-term guest on the third floor at the Mainstay Suites Hotel in Mountville, Lancaster County, Pennsylvania. Id. at 59.

In late November 2005, Mr. Pace noticed that the only elevator at the hotel would bounce when it reached a certain floor. Id. at 76. He did not report the problem to the hotel because he assumed the hotel would realize the problem and address it. Id. Mr. Pace had never noticed that the elevator door would not stay open long enough for him to enter or exit the elevator. Id. at 86. On one occasion also around late November 2005, Mr. Pace noticed that the elevator door began to close on and crashed into the hotel's luggage cart used by his driver. Id. at 99-100; see also Mainstay Exhibit C at 18-19.

On November 30, 2005, Mr. Pace entered the elevator on the first floor of the hotel positioning his wheelchair in the left corner of the elevator facing front in order to protect his right arm from contact. (Pace Dep. at 103). An elderly man and his dog entered the elevator after Mr. Pace. Id. The dog jumped on Mr. Pace's legs causing him excruciating pain. Id. at 104. Despite Mr. Pace's efforts at keeping the dog away from his legs after the dog jumped on him, the dog aggressively continued to approach Mr. Pace's legs. Id. at 156. Mr. Pace instinctively tried to exit the elevator. Id. As Mr. Pace was half-way outside of the elevator in his motorized wheelchair, the elevator door "slammed" into his

right forearm which was dangling from the side of the wheelchair. Id. at 104, 116. Upon slamming into Mr. Pace's forearm, the elevator door re-opened. He reversed his wheelchair and re-entered the elevator. Id. at 121. Even though he was taking prescribed medication, some of which for the relief of pain,[1] Mr. Pace experienced excruciating pain which caused him to faint momentarily. Id. at 125. When he regained consciousness, Mr. Pace was inside the nonmoving elevator with the door closed. He pushed the button for the third floor, the door opened, and he exited the elevator. Id. at 105.

Mr. Pace testified that he had no recollection of how long the elevator door stayed open before he initially started to move towards it. He conceded that at the time of the incident he was only concerned about exiting the elevator because of the dog and was not paying attention to the elevator door. Id. at 141-142. He also could not recall whether the dog and its owner were still in the elevator or had left it.[2] Id. at 113-114. Mr. Pace described the door slamming as fast and hard and "a shock." Id. at 161.

Mr. Pace further testified that a couple of days after the incident with the elevator, he spoke with Carmella Priloc, another guest at the hotel, who asked him what had happened to his bandaged forearm. Id. at 171. After he told her about the elevator door

---

[1] At the arbitration hearing, Mr. Pace testified that among his many medications is a Morphine pump. See Mainstay Exhibit C at 24.

[2] On June 14, 2007, William Durboraw, the dog's owner, was deposed and testified that he had no recollection of his dog jumping on the plaintiff or causing any type of problem in the elevator. In fact, he further testified that he had no recollection of ever riding the elevator with the plaintiff, although it was a possibility. See Mainstay Exhibit E.

slamming into his arm, Miss Priloc allegedly told him that she was aware that there were problems with the elevator, "that it was acting funny...and that the hotel was aware of it." Id.  On the day after the incident, Mr. Pace spoke with Carol Duke, the "pantry girl" at the hotel.  Id. at 174.  Miss Duke allegedly told him that: (1) she was aware that "the elevator wasn't acting correctly;" and that (2) Abbey, the hotel housekeeper, "was also aware that the elevator was not acting normally."  Id. at 175.

Several days after the incident, Timothy Lease, the general manager of the hotel, approached Mr. Pace and apologized to him for the injury caused by the elevator door. Id. at 178.  Mr. Lease told Mr. Pace that "these people just are a nuisance in not keeping their dogs close to them."  Id.  Mr. Lease testified that he also asked Mr. Pace if there was anything that could be done to ensure that Mr. Pace would not bring legal action against Mainstay.  See Mainstay Exhibit C at 44.  Mr. Lease also testified that before Mr. Pace's incident, no one had complained about the operation of the elevator.  Id. at 99.  He indicated that Mr. Pace had never requested to be moved to the first floor before November 2005, and that it had never occurred to him to move Mr. Pace to the first floor. Id. at 100.  Mr. Pace was a smoker and the first floor had only non-smoking rooms.  Mr. Lease further testified that Mr. Patrick Rogers, the president and general manager of Lancaster, verbally recommended to him after the incident that although the mechanical safety edge and photo unit met the state code, they should be replaced with a proximity edge as a "look out" feature which would provide a high level door protection.  Id. at 103.

4

The elevator has been operating without changes since November 2005 and there have been no further incidents with the door. Id. at 108. According to Mr. Lease, Lancaster complied with all of its maintenance agreements. Id.

     Leigh Marie Pope, the assistant general manager at Mainstay, testified that upon learning of the incident, she and Mr. Lease checked out the elevator and it seemed to be working properly. Id. at 83. To her knowledge, no one had complained about the elevator door closing too quickly or striking them as they exited or entered the elevator prior to Mr. Pace's incident. Id. Miss Pope also testified that Mr. Pace was given a room on the third floor because that is where the rooms for smokers are located. Id. at 91. Although the first floor has some handicapped-equipped rooms, Mr. Pace never requested to be moved to one before this incident. Id.

     Patrick Rogers, President and General Manager of Lancaster, testified at the arbitration hearing that his company performed preventative maintenance on the elevator on a monthly basis per the maintenance agreement with Mainstay. See Mainstay Exhibit C at 112. He inspected the elevator on December 6, 2005, five days after the incident, and found the elevator door, its electronic eye beam, and its mechanical safety edge to be operating properly. Id. at 122-123. Mr. Rogers reviewed the evidence of the service calls which showed that service technicians inspected the elevator every month in 2005 as required by the agreement. Id. at 113, 115. It is standard procedure for the technician to check the eye sensors of the elevator during the monthly check. Id. at 116. On November

14, 2005, the preventative maintenance call closest in time to Mr. Pace's incident, Lancaster's technician determined that there was a failure of the mechanical connection of the elevator door causing excessive noise. The mechanic replaced the part and remedied the situation. Id. at 114.

Mr. Rogers also testified that the maintenance documents indicated that: (1) the mechanical safety edge had been inspected on a monthly basis; (2) no repairs had been made to the electric eye beam or the mechanical safety edge prior to the alleged incident or at anytime since; and (3) there have been no reported problems with the dual eye beam sensor or the mechanical safety edge before or after the alleged incident. Mr. Rogers also testified that a properly functioning eye beam and mechanical edge will not cause an elevator door to "stop on a dime." Upon learning of the incident and inspecting the elevator door, Mr. Rogers recommended that Mainstay install a newly developed piece of extra protection as an upgraded safety device. Id. at 122.

As a result of this incident, Mr. Pace sustained a large hematoma, which required emergent right forearm irrigation and ultimately a skin graft operation. (Pace Dep. at 128-129). The first surgery was performed at Thomas Jefferson University on the day following the incident. Id. at 132. In a report to Robert Knobler, M.D., one of Mr. Pace's treating physicians, dated December 29, 2005, Louis Neureuter, M.D., indicated that "As [Mr. Pace] was entering the elevator, a dog jumped on his lap. He instinctively tried to protect himself in keeping his right, bandaged hand away from the dog and did not realize

that the elevator door was closing, and it closed on his right forearm." See Pl. Ex. E.

On November 22, 2006, Mr. Pace filed a complaint against Mainstay and Lancaster Machine Manufacturing Company,[3] with whom Mainstay had a maintenance contract, alleging that Mainstay negligently allowed the elevator to exist in a hazardous, defective, and dangerous condition, and as a result, the elevator door closed on him and caused him injury.  Mr. Pace further alleges that this condition was "negligently caused and allowed to remain by the defendants for an unreasonable period of time after Mainstay had notice, constructive notice and/or knowledge of such defective and dangerous condition."  On September 12, 2007, arbitrators rejected Mr. Pace's claims and entered an award in favor of the defendants, prompting Mr. Pace to request this trial *de novo*.

## II.  STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

---

[3] The complaint incorrectly names the defendant Lancaster Elevator Company.

A party seeking summary judgment always bears the initial responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325.  After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. at 322.  Under Rule 56, the court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.  The court must decide not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. Id. at 252.  If the non-moving party has exceeded the mere scintilla of evidence threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its

opponent. Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

### III. DISCUSSION

In the absence of direct evidence against the defendants, Mr. Pace's claims rely upon an inference of negligence under the doctrine of *res ipsa loquitur*. In their motions for summary judgment, both defendants argue that Mr. Pace cannot establish the first two of the three elements required to invoke the doctrine. Accordingly, the defendants insist that judgment in their favor is appropriate. I agree.

In some cases, where a party seeking to establish negligence does not establish the exact cause of the injury, he may rely upon *res ipsa loquitur*, a rule of evidence, that permits the jury to infer the cause of the injury from the circumstances of the event. Tait v. Armor Elevator Co., 958 F.2d 563, 572 (3d Cir. 1992). Under the doctrine of *res ipsa loquitur*, a court may infer that harm suffered by a plaintiff is caused by negligence of the defendant when: (a) the event is of a kind which ordinarily does not occur in the absence of negligence; (b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and (c) the indicated negligence is within the scope of the defendant's duty to the plaintiff. DiVittorio v. United States, 63 Fed. Appx. 604, 608 (3d Cir. Pa. 2003) (citing Gilbert v. Korvette, Inc., 327 A.2d 94, 100 (Pa. 1974) (the Supreme Court of Pennsylvania adopting the Restatement (Second) of Torts § 328D)). The Restatement (Second) of Torts § 328D also provides that it is the

9

function of the court to determine whether the inference may reasonably be drawn by the jury, or whether it must necessarily be drawn.  See § 328D(2).

Here, a review of the evidence reveals that Mr. Pace failed to establish that the incident with the elevator door was the type which ordinarily does not occur in the absence of negligence, or that there were no other responsible causes for the incident.

Richard A. Kennedy, Mr. Pace's expert, inspected the elevator and made several observations in a report dated August 29, 2007.  See Lancaster's Ex. P; see also Mainstay's Ex. G.  Mr. Kennedy indicated that the elevator was installed in 2000 by Lancaster, and was being maintained under a full maintenance type of agreement between the hotel and Lancaster.  Id. at 4.  The agreement requires Lancaster regularly and systematically to examine, lubricate, adjust and repair or replace all accessory elevator equipment as needed.  Id. at 5.  The agreement also gives Mainstay the responsibility to notify Lancaster of operational problems, malfunctions, and accidents.  Id.  Mr. Kennedy said that the elevator cab door is equipped with two safety devices:  a retractable mechanical safety edge and a dual eye beam photo-eye.  The elevator's retractable mechanical safety edge met the minimum requirement of Pennsylvania's Elevator Code. Id. at 6.  At the time of his site survey on June 18, 2007 and in the presence of counsel, Mr. Kennedy covered one of the plastic reflectors on the elevator door with his hand, yet the door began to close.  He indicated that this was contrary to the proper operation and intent of the electric eye units installed on the elevator.  Id. at 8.

Mr. Kennedy also indicated that Lancaster's maintenance effort did not follow its own defined examination schedule for the equipment to be maintained.  In fact, Mr. Kennedy felt that the maintenance Lancaster provided was without the benefit of a well-defined and proactive maintenance plan.  Id. at 5.  There is a record, however, of Lancaster performing remedial repairs to the elevator door at the second floor of the hotel on November 14, 2005.  Id. at 6.

Finally, Mr. Kennedy opined that:  (1) Mr. Pace's accident occurred because of the failure of Lancaster to perform reasonable and required maintenance and testing of the elevator in the time preceding the accident; (2) the operation of the elevator as described by Mr. Pace is of the type which does not occur in the absence of standard maintenance; (3) Mainstay failed to supervise and enforce properly its contract with Lancaster; (4) Mainstay had a duty to observe and report to Lancaster any deficient operation which may affect the safety of the public invitee; (5) if Mainstay had placed Mr. Pace in a room on the first floor, this accident may not have occurred because Mr. Pace would not have been required to use the elevator; and (6) Mainstay should have asked Lancaster to install a new electronic edge sensing device *in lieu* of the mechanical edge and electric eye door reopening arrangement.  Id. at 10-11.  Mr. Kennedy also cursorily mentioned that he had ruled out all other responsible causes including the conduct of the plaintiff and third parties.  Id. at 11.

On June 14, 2007, at the request of Defendant Lancaster, John B. Halpern also

11

performed a site inspection of the elevator.  See Lancaster Exhibit O at 1, 3.  Mr. Halpern's expert report dated August 30, 2007, indicates that the elevator was installed in 2000; that the elevator door protection features and programmed door times were in compliance with applicable regulations; that the elevator's static force and kinetic energy were in compliance with applicable regulations; and that there was no prior or subsequent history of any failure relating to the elevator door protection devices.  Id. at 3.  Mr. Halpern also indicated that elevator doors do not stop instantaneously based on the laws of physics, and typically travel three to six inches after the door protection device is activated.  Id.  Passengers on elevators can make contact with a closing door even when the door protection is properly operating and the elevator is properly maintained.  Id.  Mr. Halpern's inspection of this elevator door confirmed that it took two to four inches to stop when the photo eyes or the safety edge were activated.  Id.  Thus, it is possible for passengers to run into the closing door and/or the stationary door frame if the passengers do not take the proper care when exiting the elevator.  Id.

  Mr. Halpern also reviewed and commented on Mr. Kennedy's expert report.  First, Mr. Halpern pointed out that Mr. Kennedy incorrectly reported that there was no record of elevator maintenance for the months of April, May, June, July, and November 2005.  Id. at 4.  The evidence shows that there were, in fact, maintenance visits performed during those months and that the safety edge and photo eyes were inspected at each visit.  Id.; see also Lancaster Exhibit N.  In saying that Lancaster followed no maintenance plan, Mr.

Kennedy also ignored the existence of the checklists and charts in the machine room which provided the maintenance program or guide for the mechanics to follow. See Lancaster Exhibit O at 5.

Second, Mr. Halpern refutes the results of the on-site test of the elevator door performed by Mr. Kennedy. Id. at 4. Mr. Kennedy only covered up one of the two photo eye reflectors on the stationary door strike and the door still closed. According to Mr. Halpern, the two photo beams use two reflectors on the door strike to bounce the beam back to the receiver. Id. It is possible to cover up one reflector with a hand and reflections from the stainless steel return around the reflector and would still have enough of the beam reflecting back to the receiver to indicate that the single beam is not blocked. Id. Mr. Kennedy's demonstration did not entirely block the beam, as the beam can disperse wider than the reflector. Id. Mr. Pace claimed that he and the wheelchair were on the door's threshold when he was struck by the door. Id. That scenario was not duplicated by Mr. Kennedy's test because the wheelchair would have completely blocked both photo eye beams from reaching the reflectors or the stationary door strike. Id.

Third, Mr. Halpern noticed that Mr. Kennedy also ignored the fact in his report that the elevator door did, in fact, retract after striking Mr. Pace's arm. At least one of the devices had to be performing properly to reopen the elevator door upon impact and allow Mr. Pace to re-enter the elevator from the threshold. Id. Either the photo eyes or the safety edge or both caused the door to retract as designed. Id.

13

Finally, Mr. Halpern criticizes Mr. Kennedy for ruling out the conduct of Mr. Pace without considering the possibility that Mr. Pace simply drove his wheelchair into the closing door in his urgency to get out of the elevator after the dog rendered him in excruciating pain.  Id. at 5.  Mr. Kennedy also ignored the testimony of Mr. Durboraw who claimed that his dog never jumped on Mr. Pace, that he never saw the incident described by Mr. Pace, and that he does not ever recall riding on the elevator with Mr. Pace.  Id. at 5-6.

This evidence confirms that Mr. Pace has not shown that the incident at the hotel with the elevator door was the type which ordinarily would not occur in the absence of negligence.  To have sustained that burden of proof, Mr. Pace would have had to produce evidence which would have permitted the conclusion that his injuries were more probably than not caused by the defendants' negligence.  Micciche v. Eastern Elevator Company, 645 A.2d 278, 281 (Pa.Super 1994).  He produced no such evidence.

Mr. Pace's own testimony that the elevator door re-opened after making contact with his arm belies his claim that the elevator door was not functioning properly.  Both Mr. Pace's expert and the defense expert confirmed that the elevator door's protection features complied with the Pennsylvania Elevator Safety Code.  The uncontested evidence showed that there was no prior history of any failure relating to the door's safety devices at anytime before or since the alleged incident, and that those safety devices were inspected on a monthly basis by Lancaster.

The defense expert indicated that elevator doors cannot stop instantaneously based on the laws of physics. In fact, during the defense expert's test, the elevator door in question traveled two to four inches even after the photo eyes or the safety edge were activated, where elevator doors typically travel three to six inches after a door protection device is activated. Mr. Pace admitted that if he were to ride his wheelchair through the center of the elevator door opening, he would have only six inches of space on both sides of his wheelchair. It is reasonable to conclude that when the protective device was triggered by the wheelchair, the door continued to travel far enough to strike Mr. Pace's arm without it being considered defective. In addition, when asked whether the door moved any faster on that day than it normally did, Mr. Pace responded, "It struck me. That's all I can tell you. I have no clue." See Lancaster Exhibit F at 62-63. No evidence was presented that the door speed or force was improper.

Furthermore, Mr. Pace did not produce affidavits or other sworn testimony supporting his allegations that a hotel guest and a hotel employee knew that the elevator was acting "funny," or not "correctly." Without such proof, these allegations would be inadmissible as hearsay. See FED.R.EVID. 802.

Finally, the plaintiff has not produced evidence which would permit the conclusion that it was more probable than not that his injuries were caused by the negligence of either Mainstay or Lancaster. His testimony showed that he moved instinctively into a normally operating elevator door to avoid further pain caused by the encounter with the

dog.  There has been no evidence produced to show that there was anything wrong with the elevator.  Accordingly, because one of the three required elements necessary to invoke the doctrine of *res ipsa loquitur* is not satisfied, further inquiry is not needed.  However, out of an abundance of caution, I will consider the second required element.

Similarly, Mr. Pace has also failed to present sufficient evidence to demonstrate that there were no other responsible causes for the accident.  Although it was not necessary for Mr. Pace to exclude all other possible causes, he still must have presented a case from which a jury may have reasonably concluded that the negligence was, more probably than not, that of one or both of the defendants.  Micciche, 645 A.2d at 281 (citing Carney v. Otis Elevator Co., 536 A.2d 804 (Pa.Super. 1988)).  There are other possible explanations for what happened that day which have not been excluded, notwithstanding Mr. Kennedy's bald assertion to the contrary.  For example, Mr. Pace failed to exclude his own substantial negligence as a possible cause of the accident.  Mr. Pace testified that he had no recollection of how long the elevator door stayed open before he initially started to move towards it.  He conceded that he was only concerned about exiting the elevator because of the dog and was not paying attention to the elevator door. Given his frantic state of mind during this incident, it is reasonable to arrive at the following series of events: (1) the elevator door opened; (2) Mr. Pace wheeled himself into the elevator; (3) Mr. Pace turned the wheelchair around and positioned himself facing the door with his right arm close to the wall to protect the arm; (4) a dog and its

owner entered the elevator; (5) the dog jumps up on Mr. Pace's legs causing him excruciating pain; (6) within those few seconds, the door begins to close as designed; (7) Mr. Pace frenetically tries to escape without noticing the door's closing; (8) the wheelchair breaks the protective beam but the door continues to travel a couple of inches because elevator doors cannot stop instantaneously; (9) the closing door makes contact with Mr. Pace's arm; and (10) the door re-opens after impact, also as designed. The plaintiff does not address that scenario or exclude it as a possibility. It is, however, supported by the evidence.

Just as plausible as a responsible cause, or at least a substantial contributing factor of the accident is the behavior of the dog owner. The dog owner did not have the control of his dog that one would expect from an owner in a public place. If the dog owner witnessed the dog jump on someone who then began to retreat from the dog, then it would be expected that the owner would intervene and restrain the dog. That did not happen here. Mr. Pace testified that the dog jumped on his legs, and despite his efforts at keeping it away, the dog aggressively continued to approach the legs, causing Mr. Pace to urgently exit the elevator in an attempt to avoid further pain.

These scenarios either separately or in combination are at least as probable as any other explanation for Mr. Pace's injuries. Accordingly, the second required element for the doctrine of *res ipsa loquitur* is also not satisfied.

In conclusion, Mr. Pace has failed to produce direct evidence of negligence against

the defendants. An inference of negligence could not reasonably be drawn by the jury under the doctrine of *res ipsa loquitur* because all of the elements required to invoke that doctrine have not been satisfied. Accordingly, I will grant the motions of the defendants and enter judgment in their favor.

    An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EDUARDO PACE, | : | CIVIL ACTION |
|     Plaintiff | : | |
| | : | |
| v. | : | NO. 06-5166 |
| | : | |
| MAINSTAY SUITES HOTEL, et al., | : | |
|     Defendants | : | |

**O R D E R**

**STENGEL, J.**

    **AND NOW,** this   5th   day of November, 2008, upon consideration of the defendants' motions for summary judgment (Documents #24 and #27), the plaintiff's responses thereto (Documents #28 and 29), and the reply briefs of the defendants (Documents #30 and #31),[4] it is hereby ORDERED that the motions are GRANTED in their entirety.

    The Clerk of Court is directed to mark this case CLOSED for statistical purposes.

BY THE COURT:

    /s/ Lawrence F.Stengel
LAWRENCE F. STENGEL, J.

---

[4] Although these reply briefs were filed without leave of court, contrary to my policies and procedures, I considered them for purposes of this Memorandum.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EDUARDO PACE,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| v. | : | NO. 06-5166 |
| | : | |
| **MAINSTAY SUITES HOTEL, et al.,** | : | |
| **Defendants** | : | |

## O R D E R   O F   J U D G M E N T

**AND NOW**, this   5th   day of November, 2008, in accordance with my Order granting the defendants' motions for summary judgment in their entirety, and in accordance with Federal Rule of Civil Procedure 58, judgment is hereby entered in favor of Defendants Mainstay Suites Hotel and Lancaster Machine Manufacturing Company, and against Plaintiff Eduardo Pace.

BY THE COURT:


 /s/ Lawrence F. Stengel
LAWRENCE F. STENGEL, J.